## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

AARON KIRK and AMY KIRK,

                       Plaintiffs,

       v.

CITY OF DULUTH, MINNESOTA, a Municipal Corporation organized under the laws of the State of Minnesota, GORDAN RAMSAY, former Chief of the Duluth Police Department (in his official and personal capacity), MICHAEL CEYNOWA, current Chief of the Duluth Police Department (in his official and personal capacity), JEFFREY KAZEL, current supervisor with the Duluth Police Department (in his official and personal capacity), KRISTINA SHULETE, current officer with the Duluth Police Department (in her official and personal capacity), RONALD TINSLEY, current officer with the Duluth Police Department (in his official and personal capacity), JAMES RODMAN, current officer with the Duluth Police Department (in his official and personal capacity), STEVEN PRUSE, current officer with the Duluth Police Department (in his official and personal capacity), SARA SCHULTEE, current officer with the Duluth Police Department (in his official and current capacity), ROBERT GRYDAHL, former officer with the Duluth Human Rights Commission (in his official and personal capacity), CARL CRAWFORD, current officer with the Duluth Human Rights Commission (in his official and personal capacity), and DUSTIN JAMES TURCOTTE,

                       Defendants.

Court File No. _____

---

## COMPLAINT AND
## JURY TRIAL DEMAND

---

Plaintiffs, Aaron Kirk and Amy Kirk, as and for their Complaint against the Defendants above named, state and allege as follows:

## **INTRODUCTION**

1.       Plaintiffs bring this action as a result of—and to remedy—continuous, systematic, and ongoing racially discriminatory policies, practices, and actions by the Duluth Police Department, the Duluth Human Rights Commission, and many of their members. Since at least 2007, members of the Duluth Police Department and Human Rights Commission have racially profiled and targeted Plaintiffs based solely on Aaron Kirk's race, his inter-racial marriage, and the Kirk family's presence in a predominantly white neighborhood. These Defendants have collectively subjected Plaintiffs to near constant harassment. As just one example, the Duluth Police Department thought it appropriate to dispatch officers to the Kirks' home in response to a 9-1-1 call where the caller (the Kirks' neighbor) complained that the Kirks' young daughter was coloring outside on the sidewalk with chalk.

2.       The Duluth Police Department and Duluth Human Rights Commission allowed clearly racially motivated conduct by two of the Kirks' white neighbors, Fran McGee and Ann Panger, to continue unabated for many years. Those neighbors (the same two every time) serially called 9-1-1 to summon the police to the Kirks' residence to investigate patently (and obviously) false and baseless allegations that truly ran the gamut—from the Kirks allegedly operating a methamphetamine lab in their basement, to the Kirks' daughter drawing on the sidewalk with chalk, to suspicions that Mr. Kirk may be thinking about stealing the neighbors' roofing materials, to claims that the Kirks were

abusing their children, to allegations that the Kirks were sending their children to steal the neighbors' Meals on Wheels deliveries, to claims that the Kirks' very small dog was menacing. In every instance, responding officers found there was no good faith basis for the 9-1-1 calls. Numerous police reports refer to the calls as "unfounded." Yet they continued year after year after year, subjecting the Kirks and their children to constant harassment. The Kirks have had over 100 interactions with the Duluth Police Department—often in the presence of their children—based on obviously false and "unfounded" calls by McGee and Panger, who were intent on forcing Plaintiffs out of the neighborhood.

3.      The discriminatory policies and practices have manifested in various other ways, too. On July 10, 2020, Defendant Dustin James Turcotte used his vehicle to cut off Mr. Kirk's vehicle. Turcotte then gave Mr. Kirk the "middle finger" and admittedly shouted at Mr. Kirk, calling him a "Nigger" while Mr. Kirk was stopped at a stop light. Turcotte then followed Mr. Kirk into a parking lot and boxed Mr. Kirk's vehicle in. Turcotte again called Mr. Kirk a "Nigger" and aggressively threatened Mr. Kirk with violence, including the use of brass knuckles. Later that same day, Turcotte approached Mr. Kirk near a bank and again threatened him with brass knuckles. When a Duluth police officer arrived, Turcotte left the scene. Mr. Kirk advised the officer that Turcotte had threatened him and called him a "Nigger." When the officer left the scene to find Turcotte (who had fled), Mr. Kirk went home. An hour later, members of the Duluth Police Department descended on Plaintiffs' residence and handcuffed Mr. Kirk, arresting him in front of his children for allegedly "fleeing a police officer." And while transporting Mr.

Kirk to jail, Defendant Sara Schultee, a Duluth Police Officer, told Mr. Kirk: "I could have let you go, but you were being an asshole so I'm taking you to jail." Mr. Kirk was booked and held in the St. Louis County Jail *for four days* due to the unlawful arrest. All criminal charges against Mr. Kirk were eventually dismissed.

4.    No family should have to endure the endless harassment the Kirks have endured. The state Defendants have jointly and severally denied Plaintiffs their rights secured by the United States Constitution. Plaintiffs bring this action to redress those violations under 42 U.S.C. §§ 1983 and 1988. Plaintiffs also seek redress under the Civil Rights Act of 1964, the Federal Fair Housing Act of 1966, and Minnesota statutes. Separately, Aaron Kirk seeks relief against James Turcotte for violating Minn. Stat. § 611A.79.

## JURISDICTION

5.    This Court has subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplementary jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

## VENUE

6.    Venue is appropriate in the District of Minnesota because the events giving rise to this action occurred in Duluth, Minnesota. *See* 28 U.S.C. § 1391.

## PARTIES

7.    Plaintiff Aaron Kirk is a 52-year-old Black man who residents in a predominantly white neighborhood in Duluth, Minnesota. Mr. Kirk is married to Plaintiff Amy Kirk, who is white. They have two children. For much of the time period

4

encompassed by this Complaint, Mr. Kirk worked as a mental-health counselor in Duluth. Mrs. Kirk is a registered nurse.

8.    Defendant City of Duluth, Minnesota, is a municipal corporation organized under the laws of the State of Minnesota. The City of Duluth is a recipient of federal funds and has received federal financial assistance from the United States Department of Justice Office of Justice, Bureau of Justice Assistance ("BJA"). Through today, the City of Duluth has received at least thirty-seven awards and received at least $13,618,500 to spend for programs related to law-enforcement activities. A large portion of those funds was distributed to the Duluth Police Department.

9.    In 2008, the City of Duluth received its initial BJA Edward Byrne Memorial Justice Assistance Grant, which funding is designed to combat hate crimes and racial bias within the community. The BJA grants place emphasis on combatting hate crimes, which are also called bias-motivated crimes, motivated by some form of bias towards victims on the basis of their perceived or actual race, color, etc. BJA funds, as per the grant applications, can be used to respond to hate crimes and bias related attacks. In particular, BJA guidelines states specifically that BJA "encourages JAG recipients to utilize funding to prioritize efforts to identify, investigate, report and prevent hate crimes and other hate incidents, increase public awareness and expand/enhance the reporting of hate crimes, enhance the capacity of law enforcement to prevent and address hate crimes through education, training, and tools to prosecute hate crimes."

10.    Defendant City of Duluth and its police department have received similar BJA grants during 2008-2023. The city has also received an additional $3 million annually

since early 2000 from the United States Department of Housing and Urban Development for multiple purposes, including enforcement of the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq*. The city is still a recipient of Title VI funds for police as well as fair housing activities.

11.    As a recipient federal funds, the City of Duluth and its police department were obligated to not discriminate in the provision of law enforcement and fair housing related public services. However, the police department discriminated and failed to provide Plaintiffs, who are both intended beneficiaries of the funds, with an equal opportunity to obtain all reasonable and related police and fair housing services based solely upon Mr. Kirk's race. Multiple law-enforcement officers, including the Chief of Police, knew that the Plaintiffs were both victims of racially motivated hate incidents and there is a distinct nexus and relationship to the DJA and HUD federal grants.

12.    All individually named Defendants, with the exception of Dustin James Turcotte, are now employed or were previously employed by the City of Duluth. All mentioned officers, agents, and employees were, at all times relevant to this Complaint, working as on duty licensed and sworn Minnesota peace officers and Human Rights officers acting under color of state law and within the scope and course of their official duties and employment as officers.

13.    All supervisory police officers, including Defendants Gordan Ramsay, Michael Ceynowa, and Jeffrey Kazel, participated directly in the constitutional violations and had notice of a pattern of unconstitutional acts by the City's employees. Each of the Defendant's training practices and/or supervision was inadequate. Each of the named

6

Defendant supervisors, including the former and current Duluth Chief of Police, was deliberately indifferent in failing to train or supervise their subordinate officers.

14.    Defendant Robert Grydahl was the former Human Rights Officer of Duluth's Human Rights Commission from 2008 to 2016. Defendant Carl Crawford is now the Human Rights Officer and has held the post since 2017. Human Rights officers were and are legally responsible for Duluth's Fair Housing Act enforcement. These Defendants' actions or omissions as Human Rights officers were, at all times relevant to the Complaint, performed under color of State law and within the scope and course of their official duties and employment. The Human Rights officer, pursuant to Chapter 29C-4 of the Duluth Human Rights Ordinance, directs, coordinates, and oversees the process used for receiving complaints of discrimination under the ordinance. Said officer is also authorized to take any actions necessary to secure compliance with the Ordinance, including litigation seeking temporary relief pending final determination of the proceeding, and also including an order restraining the respondent from further acts of discrimination. Said officers are also charged with enforcing the Fair Housing Ordinance set out in Chapter 29C-11 of the Duluth Ordinance. This Chapter adopted the substantive rights, procedures, and remedies available under the Federal Fair Housing Act of 1966.

15.    Defendant James Turcotte is a white male. Mr. Turcotte resides in Duluth, Minnesota.

## FACTS

16.    In 2003, Amy Kirk moved into a corner lot, single-family home in Duluth, Minnesota. The neighborhood is predominantly white. Initially, Mrs. Kirk, who is white,

did not have any problems with the neighbors, Fran McGee and Ann Panger, who lived together in the adjacent property.

17.    In 2005, Mrs. Kirk began dating Aaron, and he eventually moved into the home.

18.    McGee and Panger did not like that there was a Black man living next door and launched a racially charged crusade to drive the Kirks out of the neighborhood. Beginning in 2007, and continuing for more than a dozen years, McGee and Panger serially called 9-1-1 and summoned the Duluth Police Department to investigate false, baseless complaints principally directed at Aaron Kirk. Record reflects that McGee and Pinger initiated at least 50 false reports to police regarding the Kirks. In effect, McGee and Panger weaponized the Duluth Police Department against the Kirks to achieve an unlawful and discriminatory purpose.

19.    The state Defendants and supervisory officers had knowledge of these serially false accusations and reports but failed to take steps to stop the constant harassment, effectively endorsing it. The state Defendants and supervisory officers also failed to properly train and supervise staff officers as to how to handle this constant harassment. Their failures were part and parcel of ongoing discriminatory policies and procedures that deprived the Kirks of their constitutional rights.

20.    McGee and Panger falsely claimed that Kirks' small dog attacked McGee's service dog. This led directly to a criminal charge against the Kirks for "harm to a service dog." The charge was later dismissed.

8

21.    McGee called 9-1-1 and falsely reported that Mr. Kirk was encouraging "aggressive behavior" in the family's dog, "Shaggy." This led to a citation for owning a "potentially dangerous dog." The citing officer did not actually witness any aggressive behavior.

22.    McGee called 9-1-1 and falsely claimed that Mr. Kirk was chasing his daughter (then 6) around the house and that she was screaming. The Duluth Police Department responded and requested Mr. Kirk to explain that he was playing with his daughter. The responding officer noted that the "child was fine." Mr. Kirk specifically advised the officer that McGee's complaint was false, unfounded, and appeared to be racially motivated. The officer did not investigate further.

23.    McGee called 9-1-1 and falsely claimed that the Kirks' dog was barking loudly. This resulted in another visit from the Duluth Police Department to Kirks' home.

24.    McGee called 9-1-1 and falsely claimed that Mr. Kirk was training his dog to attack McGee's dog. McGee advised the responding officer, Kristina Schultee, that because "no one is doing anything" about the dog, "maybe I will take care of it myself with a 44 [handgun]." Officer Schultee did not advise the Kirks of this Complaint and did not investigate McGee for violating Minn. Stat. § 609.713 (statute criminalizing threats of violence).

25.    McGee called 9-1-1 and falsely reported that Mr. Kirk was "slamming doors." This resulted in yet another visit by the Duluth Police Department. Mr. Kirk expressed his frustration to the responding officer that his family was continually having to respond to false reports.

9

26.     McGee called 9-1-1 and falsely reported (again) that Mr. Kirk was training Shaggy to be aggressive. McGee told the responding police officer, Ronald Tinsley, that she "was going to buy a gun and shoot the neighbor's dog to solve the problem." Tinsley noted in the report that he "advised against it," but did not tell the Kirks about the threat and did not investigate McGee for violating Minn. Stat. § 609. 713. Tinsley's report indicates that he referred the matter to "EngerGC," who Plaintiffs believe to be a police department supervisor. No charges were ever brought against McGee.

27.     McGee and Panger called 9-1-1 numerous times and falsely reported that Shaggy was "growling" in the Kirks' backyard.

28.     McGee called 9-1-1 and falsely reported that the Kirks' daughter was "screaming bloody murder." This resulted in another visit from the Duluth Police Department to Kirks' home. Recognizing the potential racial aspect of McGee's complaint, the responding officer wrote in his report that Mr. Kirk is a 6'5," 280-pound "BLK male." In actuality, the Kirks had just arrived home and their daughter (then 8) were excited about having won a dance prize. That excitement resulted in the police coming (again) to Kirks' home.

29.     McGee called 9-1-1 to (again) falsely report that Shaggy was barking excessively. The Kirks advised the responding officer (just as they had in the past), that they were frustrated with having to deal with the continuous false reports. The responding officer's report acknowledges that the Kirks had previously discussed the race and bias issues with the Chief of Police.

30.     The very next day, McGee called 9-1-1 to (again) falsely report that Shaggy was barking excessively inside the Kirks' home. One of the responding officers openly questioned the veracity of the report, noting that Shaggy was a small Schnauzer and any bark inside the home could not be heard outside the home. Another report states that officers interviewed a different neighbor who stated he "never hears the Kirks' dog or disturbances of any kind at their residence."

31.     Other neighbors confirmed the Kirks' complaints that the serially false reports were racially motivated. One neighbor, William McCormick Jr., told Officer Steven Purse that "he has never seen" Shaggy loose, barking excessively, or acting in an aggressive manner." McCormick also told Officer Purse that "he thinks that the problem between Ann and Fran and the Kirks is due to racism rather than to dog problems." Another neighbor, Sarah Privette, who lived next door to McGee and Panger, had no complaints about Plaintiffs and told Officer Purse that "she knows about the issues between Fran and Ann and the Kirks, and she does not want to take the chance of them 'targeting' her like they have the Kirks." Another neighbor, Denise Kari-Owen, told Officer Purse that she had no problems with the Kirks or their dog. She too told Officer Purse that she believes that the issue between the Kirks and Panger / McGee started when Amy married Aaron and that Fran and Ann do not like inter-racial relationships. All this information was relayed to Defendant Ramsay who had actual knowledge that the false reports were racially motivated.

32.     Nevertheless, the state Defendants took no action to stop the obviously false reports. So, they continued and escalated.

33.    McGee and Panger called 9-1-1 several times to falsely report a strong odor coming from the Kirks' home and their belief that the Kirks were illegally making methamphetamines. This again resulted in a visit from the Duluth Police Department. Officers, including Shawn McGovern, investigated and concluded that the report was unfounded. The same report states that calls regarding dog barking were similarly unfounded. Although the false reports (and most significantly the report that the Kirks were engaged in felony drug offenses) were very clear violations of Minn. Stat. § 609.505 (falsely reporting crime), neither McGovern nor any other Duluth police officer investigated or charged McGee and Panger. The failure to utilize protections available to all citizens, including those of a minority group, constitutes discriminatory police enforcement and discrimination in providing public services in violation of the United States Constitution.

34.    Panger called 9-1-1 to complain about the Kirks' dog, which resulted in another visit from the police. Officers James Rodman and Steven Purse responded. Kirk advised those officers that he was tired of being falsely accused and that he did not appreciate the police repeatedly showing up at his house. As the report states: "He [Kirk] also mentioned a specific incident where MCGEE in public, used 'N' word against KIRK and she also threatened to call the Ku Klux Klan." Plaintiffs considered these racial comments to be threatening, intimidating, and spoken with the designed purpose of interfering with their enjoyment of their home because of the race of Aaron Kirk. Shortly thereafter, Officer Purse contacted his supervisor, Sergeant Jeff Kazel, to discuss how to handle the situation. Officer Rodman and Sgt. Kazel convened a meeting with individuals

from the City of Duluth (as discussed) in the following paragraphs. Despite the seriousness and racially sensitive nature of the comments, said named Defendant law officers either misclassified such complaint or totally ignored it. Additionally, the failure to act demonstrated undue skepticism of the victim's accounts and thus the officers failed to collect available evidence that could corroborate them.

35.    City staff from the Police Department, including Defendant Ramsay, members of the City Attorney's office, and Defendant Bob Grydahl met jointly to discuss the extent of the claims regarding alleged continuing violations of Plaintiffs' legal and constitutional rights. Plaintiffs agreed to meet directly and in person with McGee and Panger, but they refused. The meeting ended, and the City of Duluth officials decided to take no further action. Despite the significant number of objectively false police reports, express racial slurs, and open threats of violence (which were reported by the officers themselves), Ramsay and Grydahl turned a blind eye the racial animus and discriminatory conduct of McGee and Panger, choosing instead to focus on unfounded allegations of "attacks" by the Kirks' dog. Defendants Ramsay and Grydahl failed to perform their legal obligations under the color of law as Hearing Officers.

36.    Chief Ramsay and other subsequent supervisors failed to enforce Duluth City Ordinance 9354.12-15 [CH. 40-1-15], failed to arrest McGee and Panger, and failed to refer to either State or Federal Prosecutors for criminal charges against McGee or Panger for violating the Minnesota criminal statutes (threats, false reports, etc.) as well as various provisions of the Federal Fair Housing Act, 42 U.S.C. § 3631, which empowers the U.S. government to pursue criminal charges and penalties for violations of the Fair Housing

Act. Alternatively, Defendant Ramsay, and other supervisory police members attending the meeting, should have further investigated the totality of the continuing violations and racial harassment suffered by Plaintiffs. But no adequate police action was taken by Defendants with respect to the racial threats and false reports of crimes, all of which were designed to force Plaintiffs out of their home and neighborhood solely because of Aaron Kirk's race.

37.    Defendants Ramsay, then-Lieutenant Michael Ceynowa, and Jeffrey Kazel were fully apprised and had adequate knowledge of the long-standing series of false police reports and racially discriminatory activities by Plaintiffs' neighbors. Multiple staff police officers employed by the Duluth Police Department had made and written formal police reports clearly showing that the two white neighbors threatened, intimidated, and coerced Plaintiffs because Aaron Kirk was a Black male who they did want as their neighbors. All three mentioned supervisors were involved in official decisions regarding the resolution of conflict between Plaintiffs and their neighbors. All three of the top supervisors' decision not to initiate arrests and prosecute McGee and Panger for their racial and hate bias was a command decision and was a proximate cause of the Plaintiffs' many constitutional deprivations. All three mentioned supervisors had ample time and full opportunity to personally direct their subordinates from carrying out unlawful acts to provide for equal police protection. The subordinate officers named as Defendants above, routinely, and knowingly ignored the nature and number of the excessive false reports and, by doing so, violated the Plaintiffs rights to equal protection of the laws clause of the Fourth and Fourteenth Amendments to the United States Constitution and the mandate to provide

equal public services under Minn. Stat. § 363A.12. Plaintiffs had previously contacted Defendant Ramsay and Ceynowa about the racial bias and harassment of McGee and Panger, but even after their own subordinates had learned that the 9-1-1 calls were motivated by racial hatred and bias, no significant investigation, arrests, or referral to prosecutors was undertaken by Ramsay or Ceynowa. These two Defendants failed to properly train or supervise their staff officers to do better and protect the Kirks' civil and constitutional rights. As a result, Defendants Ramsay and Ceynowa were deliberately indifferent in their failure to train their subordinate officers.

38.    Defendant Kazel likewise failed to perform his legal obligations under the color of state law. Kazel had been directly informed by subordinate officers Rodman and Pruse that McGee had called Mr. Kirk a "Nigger" and that she was going to call the Ku Klux Klan, a notorious hate-crime organization that lynched three Black males in the City of Duluth in the 1920s.

39.    Because the state Defendants took no action, the harassment from McGee and Panger continued unabated. McGee and Panger called 9-1-1 to report that Mr. Kirk sounded intoxicated *inside his home.* The report was determined to be false.

40.    McGee falsely made a police report that Mr. Kirk was walking around looking at roofing materials that McGee's contractor left on the ground. McGee said she believed Mr. Kirk was planning to steal the materials. This report was false.

41.    McGee and Panger made six separate 9-1-1 calls about Mr. Kirk allegedly having a cracked windshield.

42.     McGee and Panger called 9-1-1 to report that Kirks' daughter was drawing on the sidewalk with chalk. Remarkably, and notwithstanding the history of patently false reports, the Duluth Police Department dispatched a unit to investigate. A squad car pulled up in front of Kirks' daughter.

43.     McGee called 9-1-1 to falsely claim that Mr. Kirk was taking pictures of McGee. McGee also false claimed that Mr. Kirk had taken photos of another female neighbor. This caused the police department to come out again. Responding officers found no evidence to substantiate the calls.

44.     All the while, the Kirks repeatedly complained to the Duluth Police Department that they (the Kirks) had been the victims of false reports and related harassment since 2007. Both the Duluth Police Department and the Duluth Human Rights Commission had actual knowledge of the fact that McGee and Panger were using authorities to carry out their unlawful, racially discriminatory plan of forcing the Kirks out of the neighborhood. They did nothing to prevent it.

45.     All of this led Plaintiff Amy Kirk to send an email to Carl Crawford of the Duluth Human Rights Commission. She reiterated most of the problems she and her husband began experiencing in 2007 due to the racial bias of McGee and Panger. Her email described additional incidents, including false police reports by McGee and Panger alleging that (a) her husband had called McGee and was breathing heavily into her telephone; (b) that McGee had heard an "explosion" in Plaintiffs' basement and that Plaintiffs must have started a Meth lab; and (c) that she and her husband were abusing their infant child.  Mrs. Kirk also stated that she felt the police officer responses to the 9-1-1

calls were disappointing, to say the least, and that the attitude of a few officers made the Kirks feel like "criminals." Mrs. Kirk described her fear of the police whenever she saw a squad car and that the entire experience, *which had spanned a full decade*, had caused her, and her spouse, to panic attacks and serious anxiety. The email concluded with the statement that McGee and Panger had "targeted" the Kirks "because my husband is African American."

46.     Still, the false reports continued. McGee called 9-1-1 and falsely claimed that Mr. Kirk was building a fence *on McGee's property.* This report was so patently false that McGee would not even respond to officers about it.

47.     In a separate incident, Mr. Kirk observed an officer from the Duluth Police Department—Officer Growth—pull up to a group of five neighborhood kids who Officer Growth suspected were about to break into a nearby automobile simply because they were standing by the car. Mr. Kirk voiced his opposition to the way officer Growth treated the youth, which was unnecessarily aggressive and abrasive. As a result, Mr. Kirk was cited and arrested for "obstructing legal process" and interfering with a police officer. Shortly thereafter, all formal charges were dismissed. Mr. Kirk's complaint against the officer resulted in no discipline**.** This incident was just another in a long series of separate acts that collectively constitute one unlawful act.

48.     Most recently, in July 2020, Mr. Kirk was driving on Grand Avenue toward 40th Avenue West within the Duluth city limits. A blue colored pickup driven by Defendant Turcotte pulled out of a Holiday gas station and cut off Plaintiff's vehicle. Plaintiff sounded his horn to avoid an otherwise imminent collision. Turcotte responded

by giving Plaintiff "the finger" Shortly thereafter, Turcotte called Plaintiff a "Nigger" as Plaintiff's car was stopped at a stoplight. Plaintiff then safely accelerated his vehicle in front of the truck intending to end any conflict.

49.    In order to end the altercation, Plaintiff drove his vehicle to a nearby restaurant called the Tortoise and Hare and pulled into the parking lot. Turcotte followed Plaintiff into the lot and positioned his truck so as to block the Plaintiff's vehicle. Turcotte jumped out of his truck and shouted out "Nigger, I'm getting my brass knuckles out of my truck and beat your ass Nigger." Fearing for his life and unable to move his vehicle, Mr. Kirk exited his car and obtained a tire iron from his trunk for self-defense (if needed). Defendant Turcotte, seeing the tire iron, then left.

50.    Plaintiff left the lot and drove through an alley to a nearby bank. After Plaintiff completed his bank business, Turcotte found him and again threatened Plaintiff, saying that "I'm putting on my brass knuckles so we can talk this out." Mr. Kirk saw Turcotte get the brass knuckles out of his truck and place them in his pocket. Mr. Kirk advised Turcotte that there was nothing to talk about and that Turcotte had simply violated his space. At that time, a squad car from the Duluth Police Department arrived. Turcotte fled the scene.

51.    Officer Sara Schultee exited her squad car. Mr. Kirk immediately told the officer that "That's the guy who called me a Nigger. You need to get him." Officer Schultee left Plaintiff and began a conversation with a third-party witness. Since the Plaintiff was not detained, had not committed any crime, and had not been told to stay, he left the area to get food for his family. Within an hour, members of the Duluth Police Department

descended on Plaintiff's residence and arrested and then handcuffed him in front of his children for fleeing a police officer. Plaintiff was never told to remain in the bank parking lot. At no time did Schultee employ red flashing lights.

52.    After being put in the backseat of the squad car, Plaintiff heard Sgt. Erickson command Schultee to transport Plaintiff to jail. While inside the squad car, Schultee told Plaintiff that "I could have let you go, but you were being an asshole so I'm taking you to jail." Plaintiff was booked and detained in the St. Louis County jail and remained there for four days before being released. Schultee's actions constituted a spiteful effort to "get" Mr. Kirk for reasons unrelated to any legitimate state objective.

53.    Defendant Turcotte told officers a different version of the incident but did admit to directing the "N-word" at Mr. Kirk. A witness also confirmed that Turcotte confronted Plaintiff and used that work. Schultee nevertheless issued Mr. Kirk a citation for disorderly conduct, obstructing legal process, and reckless driving. All charges were eventually dropped.

54.    Plaintiff Aaron Kirk suffered great anxiety and emotional distress because of his false arrest and incarceration by officers Erickson and Schultee. Plaintiff's arrest and jailing were done primarily based on his race as a Black male and therefore constituted discriminatory racial profiling and false arrest.

55.    Though dating back to 2007, all incidents are property before this Court under the doctrine of continuing violations as they inflicted continuing and accumulating harm on Plaintiffs. *See, e.g.*, *Montin v. Estate of Johnson*, 636 F.3d 409, 415-16 (8th Cir. 2011).

## LEGAL CLAIMS

### COUNT I

### VIOLATIONS OF 42 U.S.C. § 1983 & 18 U.S.C § 245
### (Versus all named officers of the Duluth Police Department)

56.    Plaintiffs incorporate Paragraphs 1-55 of this Complaint as though fully set forth here.

57.    "It has been clearly established for many years that the Equal Protection Clause prohibits a State, when acting as a law enforcement officer from invidiously discriminating between individuals or groups based upon race." *Murphy vs. State of Arkansas*, 127 F.3d 750 (8th Cir. 1997). Title 42 of the United States Code section 1983 provides:" that every person who, under color of any statute, ordinance, regulation . . . of any State, subjects or causes any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in law, suit in equity or other proper proceeding for redress."

58.    A police officer can be held liable under section 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby deny equal protection to persons legitimately exercising rights guaranteed them under state or federal law. *See, e.g.*, *Smith v. Ross*, 482 F.2d 33 (6th Cir 1973). 18 U.S.C. § 245 (b)(2)(B) imposes liability for interfering with a service administered by municipality.

59.    The Duluth Police Department Officers named in this Complaint discriminated against Plaintiffs as alleged in detail above. The Fourth Amendment and Section II of the Equal Protection Clause of the Fourteenth amendment to the United States Constitution prohibit the police officers from intentionally discriminating against Plaintiffs and others based upon race and denying Plaintiffs equal protection of the laws.

60.    The Duluth Police Department Officers named in this Complaint engaged in a pattern or practice of discrimination through use of enforcement strategies, including omissions and refusals to arrest and refer for criminal prosecution, and policies that created an unjustified disparate impact based upon race and other demographic factors, all of which violate the Fourteenth Amendment's Equal Protection Clause.

61.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered physical and emotional anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, thereby entitling them to compensatory and punitive damages to be determined at trial.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1983
### (Versus all named supervisory officers of the Duluth Police Department)

62.    Plaintiffs incorporate Paragraphs 1-61 of this Complaint as though fully set forth here.

63.    Each supervisor maned in this Complaint (a) participated directly in the alleged constitutional violations; (b) after being informed of the violation through a report, failed to remedy the wrong; (c) created a policy or custom under which unconstitutional

practices occurred and were allowed to occur, or allowed a continuation of such a policy or custom; (d) was grossly negligent in supervising subordinates who committed the wrongful acts; and/or (e) exhibited deliberate indifference to the rights of Plaintiffs by failing to act on information indicating that the unlawful acts were occurring.

64.    The supervisors therefore have supervisory liability under 42 U.S.C. § 1983.

65.    As a direct and proximate result of Defendant supervisors' actions, Plaintiffs have suffered physical and emotional anguish, humiliation, inconvenience, and loss of enjoyment of life, thereby entitling them to compensatory and punitive damages to be determined at trial.

## COUNT III

### VIOLATION OF 42 U.S.C. § 2000(d)
### (Versus City of Duluth)

66.    Plaintiffs incorporate Paragraphs 1-65 of this Complaint as though fully set forth here.

67.    Title VI of the 1964 Civil Rights Act, 42 U.S.C. 2000d provides that: "No person in the United States shall, on the ground of race, color, or national Origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."

68.    Defendant City of Duluth, Minnesota and its police department have applied for, received, and continue to receive federal financial assistance for its programs and activities that are subject to the requirements of Title VI and its implementing regulations.

69.    Title VI states that no person in the United States shall, on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of,

or be subjected to discrimination under any program or activity receiving Federal Financial assistance.

70.     By reason of the facts previously alleged, and particularly by the reason of the use of Federal financial assistance by Defendants, in connection with and in support of their law enforcement strategies and practices that have an adverse and disparate impact upon American Americans, including Plaintiff Aaron Kirk, the rights of Plaintiffs under Title VI, 42 U.S.C. § 2000(d) have been violated.

71.     Plaintiffs have suffered both pecuniary and other compensatory damages as well as emotional pain and suffering because of such discriminatory conduct in amounts to be determined at trial.

**COUNT IV**

**VIOLATION OF THE FEDERAL FAIR HOUSING ACT**
**(42.U.S.C. § 3601 *et seq.*), 24 C.F.R. 100.7(iii), 42 U.S.C. § 1983,**
**THE DULUTH HUMAN RIGHTS ORDINANCE, and MINN. STAT. § 363A.12**
**(Versus Defendants Grydahl and Crawford)**

72.     Plaintiffs incorporate Paragraphs 1-71 of this Complaint as though fully set forth here.

73.     Defendants have injured Plaintiffs by deliberately disregarding the rights of the Plaintiffs under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a), (b), (c) and 3617 and 24. C F.R. § 100.7(iii).

74.     The FHA prohibits interference, coercion, or intimidation with respect to housing.

75.    24 C.F.R. § 100.400(2) prohibits an individual from threatening, intimidating, or interfering with persons in their enjoyment of their dwelling because of the race, color, religion, or national origin of such persons.

76.    Liability may be directly imposed upon an individual if they "fail to take prompt action to correct to correct and end a discriminatory housing practice by a third party where the person knew or should have known of the discriminatory conduct.

77.    As alleged above, Grydahl and Crawford, in their respective roles as Human Rights officers knew or should have known of the discriminatory conduct of McGee and Panger but failed to correct and end the intimidation and coercion that occurred over a period of over a dozen years with respect to Plaintiffs' enjoyment of their housing.

78.    Both Defendants held public offices and were charged with enforcing the Duluth Human Rights Ordinance which fully incorporated the substantive rights, procedures, remedies, and judicial review provisions available for the implementation of the Fair Housing. 24 C.F.R 100.500(a) also establishes liability under the FHA. based upon a practice's discriminatory effect, even if the practice was not motivated by discriminatory intent. Discriminatory effect is defined as "practice has a discriminatory effect where it actually or predicably results in a disparate impact of a group of persons, or creates, increases, reinforces, or perpetuates segregated housing patterns because of race."

79.    Defendants' actions as Human Rights Officers during their respective period of service to the Human Rights Commission also violated Minn. Stat. § 363A.12, which requires that all persons receive equal quality of public services, including housing services.

80.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered physical and emotional anguish, humiliation, distress, inconvenience, and the loss of enjoyment of life and housing, thereby entitling them to compensation and punitive damages to be determined at trial.

**COUNT V**

**VIOLATION OF 42 U.S.C. § 3601, et seq.**
**(Against all Duluth Police Department Defendants)**

81.     Plaintiffs incorporate Paragraphs 1-80 of this Complaint as though fully set forth here.

82.     Defendants' policies and practices over a 12-year period and beyond violated the provisions of the Fair Housing Act and Federal Regulations as mentioned in Count IV by failing to stop the race related activities designed to force Plaintiffs from their home.

83.     Defendants, by failing to end the harassment and intimidation and not providing equal police services to Plaintiffs also were directly responsible for creating a "Discriminatory Effect" as defined in 24 C.F.R. § 100.500(a) described in the prior Count to this Complaint.

84.     As a direct and proximate result of Defendants' actions, the Plaintiffs have suffered physical and emotional injuries, anguish, humiliation, inconvenience, and loss of enjoyment of life, thereby entitling them to compensatory and punitive damages to be determined at trial.

## COUNT VI

### VIOLATION OF 42 U.S.C. § 1983
### (Against Defendant Schultee)

85.    Plaintiffs incorporate Paragraphs 1-84 of this Complaint as though fully set forth here.

86.    Section 42 U.S.C § 1983 provides a cause of action for the deprivation of any rights, privileges or immunities secured by the Constitution and laws of the United States.

87.    Defendants Schultee purposefully discriminated against Plaintiff Aaron Kirk because of his identification with a particular race and therefore violated the Equal Protection Clause under the United States Constitution.

88.    As a direct and proximate result of Defendant's actions, the Plaintiff has suffered physical and emotional anguish, humiliation, inconvenience, and loss of enjoyment of life, thereby entitling him to compensatory and punitive damages to be determined at trial.

## COUNT VII

### VIOLATION OF MINN. STAT. § 611A.79
### (Against Defendant Turcotte)

89.    Plaintiffs incorporate Paragraphs 1-78 of this Complaint as though fully set forth here.

90.    Minn. Stat. § 609.2231, subd. 4(a) states that: "Whoever assaults another because of the victim or another's actual or perceived race . . . may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $3000.00 or both."

91.    Minn. Stat. § 611A.79, subd. 1 defines "Bias offense" as conduct that would constitute a crime that was committed because of the victim's actual or perceived race.

92.    Minn. Stat. § 611A.79, subd. 1 provides for a private cause of action for damages against the person who committed the offense.

93.    Defendant Turcotte committed a bias offense against Plaintiff Aaron Kirk when he twice threatened to harm Mr. Kirk with brass knuckles and twice called him a "Nigger."

94.    As a direct and proximate result of Defendant's commission of a bias offense under Minnesota law, Plaintiff Aaron Kirk has suffered general and special damages, emotional distress, punitive damages plus attorney fees as provided under Minn. Stat. § 611.A.79 in an amount to be determined at trial.

**WHEREFORE** Plaintiffs Aaron Kirk and Amy Kirk request that the Court enter judgment against Defendants, and each of them, on all Counts asserted against them to include:

1. Compensatory damages in an amount to be determined at trial.

2. Punitive damages in an amount to be determined at trial.

3. Plaintiffs' costs and attorney fees incurred in this action.

4. All available pre- and post-judgment interest.

5. All other relief the Court deems just and equitable under the circumstances.

The undersigned acknowledges that sanctions may be imposed under the circumstances set forth in Fed. R. Civ. P. 11.

**FISHMAN LAW OFFICE**

Date:  June 12, 2023                    By:____s/ Phillip F. Fishman_____

Phillip F. Fishman (MN #29622)
8751 Woodcliff Road
Bloomington, MN  55438
(612) 360-0312
phil@pfflegal.com