## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

AARON KIRK and AMY KIRK,

                    Plaintiffs,

     v.

CITY OF DULUTH, MINNESOTA, a Municipal
Corporation organized under the laws of the State of
Minnesota, GORDAN RAMSEY, former Chief of the
Duluth Police Department (in his official and personal
capacity), MICHAEL CEYNOWA, current Chief of the
Duluth Police Department (in his official and personal
capacity), JEFFREY KAZEL, current supervisor with
the Duluth Police Department (in his official and
personal capacity), KRISTINA SHULETE, current
officer with the Duluth Police Department (in her
official and personal capacity), RONALD TINSLEY,
current officer with the Duluth Police Department (in
his official and personal capacity), JAMES RODMAN,
current officer with the Duluth Police Department (in
his official and personal capacity), STEVEN PRUSE,
current officer with the Duluth Police Department (in
his official and personal capacity), SARA SCHULTEE,
current officer with the Duluth Police Department (in
his official and current capacity), ROBERT
GRYDAHL, former officer with the Duluth Human
Rights Commission (in his official and personal
capacity), CARL CRAWFORD, current officer with the
Duluth Human Rights Commission (in his official and
personal capacity), and DUSTIN JAMES TURCOTTE,

                    Defendants.

File No. 0-23-cv-1758
(PJS-LIB)

---

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISMISS

---

Plaintiff submits this memorandum in opposition to the Defendants' Motion to Dismiss. This Court should deny the motion.

## FACTS

Plaintiffs are an interracial married couple living in a largely white neighborhood in Duluth, Minnesota. For over a decade, and continuing through 2019, both Plaintiffs were the victims of multiple racial and ethnic threats, harassing behavior, and unfounded charges of having committed criminal acts by two white women who resided next to Plaintiffs. Despite clear and convincing evidence of their animus towards Plaintiffs, representatives of the Duluth Police Department deliberately ignored the Plaintiffs repeated requests for municipal police services to stop the neighbors' illegal behavior designed to force the Plaintiffs to flee their current home.

Named and clearly identified officers of the Duluth Police Department were authorized to respond to dozens of 911 calls lodged by two white citizens, Fran McGee and Ann Panger. (Compl. ¶2). Numerous police officers who responded noted that most of the calls were unfounded. (*Id.*). City staff from the Police Department and Duluth Human Rights Commission met to discuss the extent of the claims regarding the continuing violations of the Plaintiffs rights. Defendants Ramsey and Grytdahl, and others present at that meeting, had actual knowledge that the Plaintiffs were in fact subjected to threats, intimidation, and false criminal accusations, but took no remedial action or offered adequate police services. (Compl. ¶3). Defendant Ramsey and other subsequent supervisors failed to enforce a Duluth Ordinance that could stop excessive 911 calls and

fine persons who abused municipal services. (Compl. ¶36). Officer Shawn McGovern responded to a 911 complaint made by Fran McGee that the Kirks were illegally making meth; this false accusation is a crime under Minnesota criminal law, but no referral for prosecution was made. (Compl. ¶33).

On June 2017 Mike Ceynowa, then a supervisor, wrote Amy Kirk an e-mail directing subordinate officers to avoid responding to nonactive emergency calls made by McGee and Panger; the e mail- also stated that "the Kirks feel that McGee's behavior is racially motivated as Aaron Kirk is African American and McGee's issues are largely with Aaron. Calls reference the Kirk's from McGee and Panger support their belief." (Declaration of Phillip F. Fishman [ "Fishman Decl."] Exs. C and (Declaration of Amy Kirk [ Kirk Decl."] Ex A. Other Duluth Police officers including Defendant Jeff Kazel were told that McGee had called Aaron Kirk the "N" word and threatened to call the KKK.

Again, despite the existence of racial threats designed to force the Plaintiffs out of their home, no adequate police services were provided. (Compl. ¶34). The individually named Defendants are licensed Minnesota Pease officers and Duluth Human Rights Commission Officers all acting under color of law. (Compl. ¶12.) The Caption to Plaintiffs' Complaint states, 10 times, that the City of Duluth officers are being sued in their official and personal capacity. The Kirks alleged that the failure to utilize municipal services and protections available to all citizens, including those of a minority group constituted discriminatory police enforcement. (Compl. ¶33). The Defendant officers and supervisors also failed to take any adequate police enforcement even though McGee twice threatened to use or purchase a" 44" to take care of the problem with Kirk's dog. (Compl. ¶26).

Plaintiffs told the police officers many times that they were frustrated with having to deal with {their neighbors} false reports; the Plaintiffs had discussed these racial issues with Chief Ramsey. (Compl. ¶29).

Defendants Ramsay, Michael Ceynowa and Kazel knew about the long-standing series of false police reports and discriminatory activities by the white neighbors who did not want a Black male {Aaron Kirk) in their neighborhood. These Defendants did not initiate arrest or prosecute McGee and Panger. (Compl. ¶37). All supervisory police officers, including Defendants Gordon Ramsay, Michael Ceynowa and Jeffery Kazel participated directly in the constitutional violations and, by so doing, violated the Plaintiffs rights to equal protection of the laws clause of the Fourth and Fourteenth Amendments to the U. S. Constitution to provide equal public services. (Compl. ¶¶13, 37.)

In July 2020, Defendant Turcotte pulled out of a Holiday gas station and cut off Plaintiff Aaron Kirk's vehicle and Plaintiff sounded his horn. Turcotte responded negatively by giving Plaintiff the finger and shortly later called Kirk a "nigger". Plaintiff left the area to avoid further problems, but Turcotte followed Kirk and continued his racial insults. He also threatened Plaintiff with brass knuckles. (Compl. ¶¶48-49). This was observed by an unknown third-party witness. Turcotte fled the scene when Defendant Schutte arrived. Plaintiff told officer Schutte that "that is the guy that called me a Nigger. "Shutte began a conversation with the unknown witness and Plaintiff left the scene. (Compl. ¶51). Plaintiff was arrested and taken to jail for 4 days and charged with disorderly conduct, obstructing legal process and reckless driving. All charges were eventually dropped. Turcotte admitted that he did use the "N" word. (Compl. ¶53). Plaintiff's arrest

and jailing were done primarily based upon his race as a Black male and therefore constituted discriminatory racial profiling and false arrest. (Compl. ¶54.) In contrast to Kirk's multiple charges, Turcotte was cited for using offensive language.

The City of Duluth Ordinance 9354.12-15 was not enforced by any member of the Duluth Police Department by Defendant Ramsay and other subsequent supervisors. Additionally, the named Defendants failed to refer any of the unfounded 911 calls or excessive incident reports to City or County Prosecutors or to members of the Duluth Human Rights Commission. (Compl. ¶36.)[1] See fn.1.pertaining to below Ordinances & DPD policies.

Policy 100 of the Duluth Police Department sets out the policy and outlines various Peace Officer Powers. Section 100.1 notes that the Duluth officers have the authority and responsibility to enforce all ordinances of the City of Duluth. Under this section, officers are to take all reasonable steps to enforce the law and when an incident is unclear of the appropriate disposition, they should consult their unit leader.

Policy 321 of the Duluth Police Department spells out the purposes and scope of Hate or Prejudice Crimes, definitions, and procedures for investigating such crimes. Section 321.1 states that the Duluth Police Department places a high priority on the rights of all individuals guaranteed under the constitution and laws of this state. When such rights are infringed upon by violence, threats or other harassment, this department will utilize all

---

[1] *See* Fishman Decl, Exs. A-G.

available resources to see that justice is served. "This policy has been developed to meet or exceed the provisions of the Shepard/Byrd Hate Crimes Prevention Act."[2]

Section 321.2 defines Hate or Prejudice Crimes as conduct that would constitute a crime and was committed because of the victims' s race. Section 321.3 notes that victims should be provided victim assistance by police officers by providing available information on local assistance programs and organizations as per Section 321.4 (f). Other significant requirements are set out under 321.4.[3]

The City of Duluth Ordinance No. 6954 sec.1 {Ch. 40 – Police} with respect to false reports of crimes states" no person shall report. To the police division of the city, by telephone, in writing, or by any other means ...any felony, gross or other misdemeanor knowing that <u>no</u> such felony, gross misdemeanor…has, in fact, been committed.

City of Duluth Ordinance No. 9354 [Article III. User Charge for Excessive Consumption of Police Services – Ch. 40 sec. 9] allows the city to collect a fee from a person in charge of nuisance events or activities that generate extraordinary cost to the city over and above the cost of providing normal law enforcement services and police protection citywide. Section 40-11 details what a police officer can do once he/she determines that there is a threat to the public peace, health, safety, or general welfare, namely informing the violator, in writing, that subsequent police response might lead to the imposition of a police service fee. Section 40-10 (h) defines a nuisance event and

---

[2] *Id.*
[3] *Id.*

includes "fighting or use of obscene or inflammatory language," *e.g.*, "N "word and or "KKK."[4]

Minn. Stat. § 609.78 deals with Emergency Telephone Calls and Communications. Pursuant to section 609.78, subd. 1(4), it is a misdemeanor for a person to make a call for emergency police service knowing police emergency exists.[5]

**FACTS PERTAINING TO TITLE VI AND
VIOLATION OF FEDERAL HOUSING ACT**

Amy Kirk informed Carl Crawford of the Duluth Human Rights Commission of the fact that she was targeted by her two white neighbors because her husband is an African American. The e -mail reiterated most of the problems she and her husband were experiencing due to racial bias of McGee and Panger. The attitude of the police response to 911 calls was disappointing and that the attitude of a few officers made the Kirks feel like criminals. (Compl. ¶45). Both Crawford and Grytdhal knew of the discriminatory conduct by McGee and Panger but failed to end the intimidation …with respect to the Plaintiffs enjoyment of their housing. (Compl. ¶77). The Duluth Human Rights Ordinance fully incorporates the substantive rights, procedures, and judicial review provisions available for the implementation of the Fair Housing Act. If a practice has a discriminatory effect, there does not have to be discriminatory intent. (Compl. ¶78).

---

[4] *Id.*
[5] *Id.*

Carl Crawford was aware of the long-standing problems and racial harassment against Plaintiffs; he was one the city employees that was seeking to end the conflict with respect to interference with the housing rights of Plaintiffs.[6]

With respect to facts alleging violations of Title VI, the Complaint states that the City of Duluth receives federal funding from the Department of Justice and that the Duluth Police Department obtained a large portion of those funds. (Compl. ¶8). Duluth has received BJA funds from the Byrne Memorial Justice Assistance Grant, which funding is designed to combat hate crimes and racial bias. Recipients of these funds are to prioritize efforts to identify, investigate and report hate crimes. (Compl. ¶9). Duluth also receives funds from the U.S. Department of housing and Urban Development, in part for enforcement of the Federal Fair Housing Act. (Compl. ¶10).

The police department [Duluth} discriminated against and failed to provide Plaintiffs, who are both intended beneficiaries of the funds, with equal opportunity to obtain all reasonable and related police and fair housing services based solely upon Mr. Kirk's race. Multiple law enforcement officers knew that.

The Plaintiffs were both victims of racially motivated hate incidents and there is a distinct nexus and relationship to the DJA and HUD federal grants. (Compl. ¶12)

In 2016 the City of Duluth Received a BJA grant seeking to deal with chronic offenders. On page 14-15 of the grant application, the city's grant writers highlighted

---

[6] The United States Supreme Court recognized the applicability of the "continuing violation doctrine to the Federal Housing Act. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-381 (1982).

success with a resident who was the source of 160 calls for service which ranged from disturbing neighbors and disorderly conduct. The caller had mental health issues. Responding officers were advised to write tickets using the Minnesota state statue. The grant allowed for officer intervention and led to fewer police contacts "making her neighbors happy and freeing up valuable police resources. (Fishman Decl. Ex. H).

## ARGUMENT

### I.    Legal standard.

On a Motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court will assume the truth of all factual allegations in the complaint and make all reasonable references in favor of the nonmoving party but is not bound to accept the truth of legal conclusions couched as factual allegations. *Delker v. MasterCard Int'l, Inc.*, 21 F4d 1019, 102 (8th Cir. 2022) (citing *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544, 555 (2007)). The standard is simply that the alleged facts state a claim "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

In ruling on a 12 motion to dismiss, courts may consider public records and "documents necessarily embraced by the complaint" without converting the motion to one for summary judgment. *Enervations Inc. v. Minn. Min & Mfg. Co*., 380 F.3d 1066, 1069 (8th Cir. 2004); *accord Zean v. Fairview Health Servs*, 858 F3d 520, 526 (8th Cir. 2015). Therefore, the multiple police reports, e-mails, official police directives, police department operating policies and matters related to Duluth federal assistance contained in the Declaration/s of Phillip Fishman and Amy Kirk, are subject to consideration in resolving the instant motion.

**II.    Plaintiff's Claims asserted in Count I, II and VI state a plausible cause of action.**

Counts I, II, and III of the Complaint incorporated all prior paragraphs. In this regard, it is essential to stress that the Duluth supervisory officers knew that there was racial hostility towards the Plaintiffs as early as November 2008. Most of the 911 calls were unfounded. (Compl. ¶2)., Defendant Ramsey and other subsequent supervisors, as well as named officers, failed to enforce a Duluth Ordinance that would have stopped the harassment. (*Id.*). The supervisory officers and other individual named officers failed to take remedial action. (Compl. ¶3). No action was taken by the police supervisor Jeff Kazel when he learned that Aaron Kirk was called the "N" word by Mcgee. (*Id*). Defendant Ramsey was also aware of the Plaintiffs' concerns and did nothing to stop the excessive 911 calls which were designed to force the Plaintiffs from their home. (Compl. ¶¶13, 37). Simply put, the Plaintiffs put the Defendants" on notice" regarding the conduct of the named Defendants which led to the violation of Plaintiffs' right to Equal Protection to the law as guaranteed in the Fourteenth Amendment to the U.S. Constitution.[7]

Defendant Mike Ceynowa, current Chief of the Duluth Police Department agreed and validated the Plaintiffs' contention that the McGees were acting in a harassing and racial manner; he issued a directive to the department that supervisors must be contacted before any further contact is made with the Kirks. However, this memo had little effect as it was written 10 years after the Kirks' ongoing problems with their white neighbors.

---

[7] Plaintiff dismisses that part of Count I that claims a violation of 18 U.S.C § 245.

Ceynowa also set out the possibility of imposing fines for excessive 911 use. (Kirk Decl. Ex. B.) Defendant Ramsey and other named officers knew that McGee's calls were racially driven to force the Kirks from their home, but Defendant Ramsey and others stood by "with a blind eye" to the ongoing harassment.

The Equal Protection clause of the Fourteenth Amendment would be violated by any selective denial of protective services to "certain disfavored minorities." *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197 n.3 (1989). A growing number of Plaintiffs are turning to section 1983 claims and alleging equal protection violations for a police department's failure to provide protection from domestic violence. *See Soto v. Carrasquillo*, 878 F. Supp. 32, 328 (D.P.R. 1995).

Plaintiffs here have clearly and succinctly alleged that the failure to utilize municipal police services available to all citizens, including those of a minority group, constitutes discriminatory police enforcement and discrimination in providing public services in violation of the U.S. Constitution. (Compl. ¶33). By way of summary, the allegations reference: (a) failure to enforce municipal ordinances that were available to end the hostile neighbor behavior; (b) failure to arrest neighbors for false reports of criminal activity under Minnesota criminal statutes; (c) failure to investigate hate and bias criminal conduct when McGee called Aaron Kirk the "N" word and threatened to call the KKK; (d) failure to refer any of the more serious incidents of criminal threats to a city or county attorney. This is especially true with respect to Count VI. Kirk was taken to jail and the white racist Defendant Turcotte was issued a citation and did not go to jail.

The previously referenced Duluth ordinances set out above do not contain any classification, yet they must be applied evenhandedly. Any law, including municipal ordinances, may be applied in a manner that creates a classification. Plaintiffs have alleged that the Duluth police officers and Human Rights Commission Officers failed to enforce the ordinance in favor of the white neighbors such that it caused a discriminatory effect on members of a minority race. This fact would establish that the law as applied involved a racial classification. *Yick Wo v. Hopkins*, 118 U.S. 356 (1896) (holding tha the discriminatory application of an ordinance banning hand laundries constituted a racial classification which had to be invalidated). Furthermore, the Equal Protection Clause would be violated if the government were to "selectively deny its protective services to certain disfavored minorities." *DeShaney*, 489 U.S. at 197 n.3.

What possible explanation can the named Defendants offer to explain their failure to act against the two white neighbors? All supervisors came to understand that the 911 calls had nothing to do with the behavior of Kirks' dog, but rather the nature of the Kirks' inter-racial marriage. (Fishman Decl. Ex. C at pages S & Y). Many of the Kirks' neighbors told the police officers that there was no problem with the dogs, but rather the calls were the product of McGee's racism. Defendant Ramsey knew about the racial aspect as did Lieutenant Mike Ceynowa. (Compl. ¶31).

The Complaint alleged that the state actors purposefully discriminated against Plaintiffs because of Aaron Kirk's identification with a particular disadvantaged group. The Duluth Police Department Officers named in the Complaint intentionally discriminated against Plaintiffs and others "based upon race" and denied Plaintiffs' equal

protection of the law. (Compl. ¶59). When a civil rights plaintiff seeks numerous requests for law officer help and the evidence indicates that very little of an investigation was carried out as to threats or any reports filed, such evidence raises issues of fact for a jury. *Green v. Francis*, 705 F.2d 846 (6th Cir. 1983).

With respect to properly informing Defendants as to whether the named Defendants are being sued in their official or individual capacity, in the Eighth Circuit a Plaintiff can easily meet the pleading requirement by indicating that he/she 'sues each and all defendants in both their individual [personal] and official capacities. *Lopez-Buric v. Notch*, 168 F. Supp. 2d 1046 (D. Minn. 2001). The instant Complaint clearly states that each named City Defendant is being sued in both "his official and personal capacity." Since the Caption of the Complaint is merely the introduction and part of the Complaint, counsel for the Defendant mistakenly argues that the caption is not part of the Complaint. (*See* p. 12 fn.7 of Defendants Memorandum of Law in Opposition). That is not accurate.

More important, however, the case relied upon by Defendant in its motion to dismiss is distinguishable from the instant case before the court. In *Johnson v. Outboard Marine Corp.*, 172 F3d. 531, 535 (8th Cir 1999), both the original and amended Complaints failed to give any indication as to how the sheriff and his deputies were being sued; they were just listed by the names and nothing else. Finally, the Kirks Complaint contains no *Monell*, or official violation counts whatsoever, which is another reason why all of the state actors are, by definition, being sued in their personal capacity. Simply put, Defendants have been given prompt notice of potential personal liability in this litigation. The word "personal capacity" is recognized to mean individual capacity as it too seeks to impose personal

liability upon a government official for actions taken under color of law. *Hester v. Redwood County*, 885 F. Supp 2d 934, 943 (D. Minn. 2023).

### III.   Plaintiffs' section 1983 claims are not barred by the statute of limitations.

The Plaintiffs' Complaint was filed, and the action commenced on June 12, 2023. Accordingly, all that occurred during the time June 12, 2017 to the above date is well within the six-year 1983 statute of limitations as are the claims set out in Count VI against Defendant Schutte for her illegal arrest and jailing of Aaron Kirk which occurred on July 10, 2020. The specific continuing unlawful acts of the Defendant police officers and Human Rights  Officers did, in fact, span a time period prior to June 12, 2017, but should be considered within the applicable statute of limitations for the instant 42 U.S.C. claims by virtue of the doctrine of continuing violation as well by  as the equitable doctrines of equitable estoppel and equitable tolling—both of which Plaintiff will seek leave to affirmatively plead in a subsequent amended Complaint.

With respect to the events alleged in the Complaint that transpired before June 12, 2017, it should be noted that there is a common, ongoing aspect to the unlawful activity, namely that the Plaintiffs were denied adequate municipal police and fair housing services each time they were requested. By contrast, the next store neighbors- both of whom were Caucasian- were able to obtain immediate police services by simply calling 911 for help. The neighbors made excessive false calls and reports requiring the expenditure of time and unnecessary cost to the City of Duluth.

The Plaintiffs have not alleged that they were adversely affected by one discrete act, but rather their Complaint details multiple unconstitutional and on-going deprivation of equal protection to the laws under the Fourteenth Amendment due to the selective enforcement and inadequate access to municipal police and fair housing services. The Kirks claim may be akin to a prisoner's Eight Amendment claim involving repeated enforcement of certain polices against a plaintiff rather than claims that allege merely ongoing consequences from an older, challenged and discreet action. "Not every plaintiff is deemed to have permanently sacrificed his or her right to obtain injunctive relief merely because the statute of limitations has run as measured from the onset of the objected condition or policy." *See Montin vs. Estate of Johnson*, 636 F3d 409, 415 (8th Cir 2011). The Eight Circuit recognized that, like the Kirks inability to obtain equal access to available municipal services, Montin's claim potentially involved alleged ongoing daily restrictions each of which plausibly could constitute a new constitutional violation with each passing day. The instant Plaintiffs are similarly situated to the Montin even though the time span of violations was spread over a longer period.

It must be noted that at least one or more of the Defendants' constitutional violations did occur during the June 12, 2017 – June 12, 2023, time period so as to satisfy the one timely act requirement necessary for the continuing violation doctrine to apply. *Id.* at 415-16; Compl. ¶48. In this regard, Count VI of the Complaint alleges another continuing violation of deliberate discrimination against Aaron Kirk that occurred within the necessary time, namely July 2020. (Compl. ¶¶ 48-53).

The United States Supreme Court has also weighed in on the application of the continuing violation doctrine and provides additional analysis as to how the doctrine can apply to the instant litigation. In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Court, in part held, that a EEOC charge alleging a hostile work environment will not be time barred if all acts constituting the claim are part of "the same unlawful practice and at least one act falls within the time. The Court also noted that in neither instance is a court precluded from applying equitable doctrines that may toll or limit the period. And as discussed above, the U.S. Supreme Court has ruled that the continuing violation doctrine also applies to Federal Housing Act litigation.

If a law enforcement agency continues to act, both aggressively by constantly requiring a citizen to respond over and over to unfounded 911 complaints and yet, at the same time fails to provide adequate police services to that same citizen because of said complaints, is it not artificial to exclude the early acts because they fall outside of the statute of limitations?

**IV.    The Court may also allow claims that arose prior to June 12, 2017, by applying either the doctrine of equitable estoppel or equitable tolling.**

Specific named supervisory Duluth Police officers all knew about the true nature of the neighbors' complaints. Yet, during their many contacts with the instant Plaintiffs, the Defendant supervisors deliberately mislead Plaintiffs by telling them they would stop the chronic complainers, namely McGee and Panger. These assurances and actions were made by the named Defendants with a clear understanding that the then pro se Kirks would cause the Plaintiffs to delay filing any separate legal actions. Defendants were well trained and

experienced peace officers. They had multiple police tools at their disposal to stop the neighbors from continuing their racial vendetta upon the Plaintiffs. As a result, these Defendants should, in the interest of justice, be estopped from asserting the applicable statute limitations for both the 1983 as well as FHA claims presented in this litigation.

## V. Counts I and IV properly allege the elements of an Equal Protection Violation despite absence of allegations pertaining to how the Defendants treated persons similarly situated to Plaintiffs.

Under Section 1983, to state an Equal Protection claim, the Plaintiff must allege that the state actor purposefully discriminated against him because of his identification with a particular disadvantaged group. *Payton v. Rush Presbyterian St. Lukes Medical Center*, 184 F 3d. 623, 632 (7th Cir. 1999). Plaintiff alleged that since 2007, members of the Duluth Police Department and Human Rights Commission have racially profiled and targeted Plaintiffs solely on Aaron Kirk's race and his inter-racial marriage, and the Kirk family presence in a predominately white neighborhood. (Compl. ¶1). This very allegation, standing alone, implicitly calls attention to the claim that Plaintiff Aaron Kirk was treated differently than non-whites living in the same neighborhood as he was subject to racial profiling and others were not. Similarly, in Paragraph 33, the Plaintiffs alleged that "the failure to utilize protections to all citizens, including those of a minority constitutes discriminatory police enforcement discrimination in providing public services in violation of the U S. Constitution." Once again, there is clear reference to the Plaintiffs' claim that they are being treated differently than others similarly situated.

Failure to allege that the Defendants treated nonblacks differently in similar situations is not required nor is it fatal to state an Equal Protection claim. In *Village of Arlington Heights Metropolitan Housing Development Corp*., 429 U.S. 252 (1977), the United States Supreme Court stated that both circumstantial and direct evidence can be considered when determining whether an invidious discriminatory purpose was a motivating factor of official action. *Id*. at 266; See also Campbell v. City of As Berwyn, 815 F. Supp. 1138 (N.D. Ill. 1993) ("While this court can consider the discriminatory impact of Kravcik's actions, proof of discriminatory impact is not a necessary component of a valid Equal Protection claim as defendant suggests."). Furthermore, the Supreme Court in *Arlington* stated that a single invidiously discriminatory government act is not necessarily immunized "by the absence of such discrimination in the m making of other comparable decisions." *Arlington*, 429 U.S. at 266 n.14.

Therefore, contrary to the Defendants contention, the instant Plaintiffs did not have to allege discriminatory impact in the form of allegations that non-blacks received the desired level of police protection and municipal services in circumstances like those in which Plaintiffs did not receive such protection in order to establish a valid claim.

In *Lyle v. Teresi*, 327 F. Supp. 683 (D. Minn. 1971), Judge Neville of the U.S. District Court for the District of Minnesota commented he was aware that there was no substantial evidence as to how defendants treated whites, or that they treated them differently than blacks. The court also stated that "If a Plaintiff in  this type  of case is required to prove an exact standard or treatment  of whites, it is doubtful whether any plaintiff ever will be able to establish  a case." *Id.* at 685.

**VI. Count 2 states a cause of action as Plaintiff has identified the intended Defendant supervisors who failed to act in multiple paragraphs of the Complaint.**

As discussed earlier, the caption of the Complaint contains a concise statement as to how each supervisor is sued, namely in both his/her official and personal capacity. Also as discussed above, there was no need in Count II to allege anything about differential treatment between others similarly situated.

The police supervisors were clearly identified throughout the Complaint. They are Defendants Gordon Ramsay, Michael Ceynowa, and Jeffery Kazel. (Compl. ¶13). Defendant Ramsay was informed by Officer McGovern about the racial animus of the Kirks' white neighbors and therefore had actual knowledge, but Ramsay took no action. (Compl. ¶¶31-32). Defendant Jeff Kazel was told about the racial slurs and threats to call the KKK. (Compl. ¶34). Defendants Ramsay and Defendant Grytdahl were at a meeting to discuss the ongoing harassment of the Kirks and had actual knowledge concerning the existence of racial slurs threats against the Plaintiffs. Ramsay and other supervisors failed to enforce the Duluth City Ordinance or arrest or refer the matter to various prosecutors. (Compl. ¶36).

Then Lieutenant Mike Ceynowa and Jeffery Kazel were fully apprised of problems between Plaintiffs and their neighbors and, as supervisors, were involved in official decision making. These Defendants knowingly ignored the nature of the excessive false reports, and by doing so violated the Plaintiffs rights to equal protection of laws. (Compl. ¶37).

Plaintiffs are aware that Section 1983 liability cannot attach to a supervisor just because a subordinate violated someone's constitutional rights. *Otey v. Marshall*, 121 F. 3d 1150, 1155 (8th Cir. 1997). When, however, as in the instant case, liability is premised on a supervisor's deliberate indifference to misconduct, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he or she might see. *Kahle v. Leonard*, 477 F3d 544, 551 (8th Cir (2007). The Defendant police supervisors are liable under section 1983 by virtue of their direct participation in the constitutional violation. *Fundiller v. City of Cooper City*, 777 F.2d 436, 1443, (11th Cir. 1985) (recognizing that the nexus between the causation question and the supervisor's response to prior incidents can be established when the official fails to take corrective action).

## VII.    The Complaint state a claim under Title VI.

The Plaintiffs Complaint with respect to pleading a plausible violation of VI contains every element needed to meet the pleading standard. First, Plaintiffs have claimed to be intended beneficiaries of a federally funded program; second, plaintiffs have plead that there was a nexus between the alleged discrimination and a specific program that receives federal funding; third, the Plaintiffs have alleged that the City of Duluth receives federal funds in two forms. First, the City receives funds from the Department of Housing and Urban Development for multiple purposes, including enforcement of the Federal Housing Act 42 U.S.C. 3601, *et. seq*. Second, the City receives funds from the U.S. Department of Justice, in part to combat hate crimes motivated by some form of bias towards victims based upon their race. (Compl. ¶¶ 8-11).

The City of Duluth is mentioned in all the relevant paragraphs and most notably in paragraph 11 whereby Plaintiffs state that: "As a recipient of federal funds, the City of Duluth and its Police Department were obligated to not discriminate in the provision of law enforcement and fair housing services. However, the Police Department [an agency of the City of Duluth] discriminated and failed to provide Plaintiffs with an equal opportunity to obtain all reasonable and related police and housing services based "solely upon Mr. Kirk's race."

In the final analysis then, the Defendants' position is not sound regarding Plaintiffs' Title VI claim. There is no mention of disparate impact based upon race which is applicable to another Count; there is no City policy being challenged, but rather that the federal funds are not being correctly used for certain intended beneficiaries. *See Davenell L. Ash & Unique Beauty and Hair Supply, L.L.C. v. City of Duluth*, 331 F. Supp 3d 935 (D. Minn. 2018). This case sets out the acceptable pleading requirements for a plausible Title VI claim; the Plaintiffs have met this pleading standard. *See also Neighborhood Action Coalition v. Canton, Ohio*, 882 F.2d. 1012 (6th Cir 1989) (reinstating Title VI claims similar to that alleged here).

Plaintiffs acknowledge that a violation of a federal regulation standing alone does not support a 1983 claim. However, regulations implementing a section of a federal law [*e.g.*, FHA] are treated separately as long as they have a relationship to the section being enforced.

**VIII. Count IV of the Complaint states a claim for relief pursuant to the Federal Housing Act, 42. U.S.C. § 3601 and 42 U.S.C § 1983.**

With respect to the Defendants contention that the 1983 claim, set out in Count IV, is time barred against Defendant Grytdahl the Court is invited to consider the case of *Hester v. Redwood County*, *supra*. There, the court recognized that "where state law provides multiple statutes of limitations for personal injury actions, courts considering 1983 claims should borrow the general or residual statute for personal injury actions." (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). To this end, Minnesota law provides a six-year statute of limitations. *See* Minn. Stat. § 541.05(5).

Defendant Grytdahl, head of the Duluth Human Rights Commission during the time 2007-2016, was at a duly convened meeting to discuss the on-going neighbor dispute along with Defendant Ramsay and other city officers. (Compl. ¶¶ 14, 35). As department head, Grytdahl had the tools to secure compliance with the fair housing portion of the Duluth Ordinance, but he chose to ignore the confirmed report of racial animus by Fran McGee which had been occurring unabated for many years. Since the underlying threats were still occurring in June 2017, Defendant Grytdhal is liable under the doctrine of continuing violation.

For the same reasons as mentioned above, Defendant Carl Crawford is also liable under 1983 for turning a blind eye to the clear and convincing evidence that the two white neighbors were deliberately trying to force the Plaintiffs out of their home and neighborhood based solely upon the fact that Aaron Kirk is Black. (Compl. ¶¶ 14, 44, 45).

**IX.  Count IV of the Complaint states a violation of Section 1983 by virtue of Defendants Grytdahl and Crawford's failure to enforce sections 3604 (b) and section 3617 of the Fair Housing Act (FHA), 42 U.S.C. 3601 et seq.**

First and foremost, it must be understood that Plaintiffs did not plead any set of facts alleging that Grytdahl or Crawford violated Section 3604(a) relating to discrimination in the sale or rental of housing.  Court IV, however, clearly claims a violation of section 3617 of the FHA which states: "It shall be unlawful to coerce, intimidate threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604 3605 04 3606 of this title." Section 3604 (b) states that it is unlawful to discriminate against any person in the terms, conditions of sale or rental or the provision or services in connection therewith, because of race, color, religion. Jurisprudence also supports the argument that Section 3604 (b) applies to services generally provided by governmental units such as police protection. accord: *Southend Neighborhood Improvement Ass'n v. Cnty of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984).

The federal courts of appeal are currently split as to whether the FHA covers post-acquisition conduct. According to commentators, most of the courts favor permitting section 3604(b) claims alleging the discriminatory provision of municipal services to residents, but several do not. *See* Robert G. Schwem, HOUSING DISCRIMINATION LAW AND LITIGATION sec. 14.3 (2013).  The author collects cases at footnote 36 and comments that the HUD regulations might be key to resolving the issue. One of the regulations spelling out prohibited practices under the FHA express states that it is a prohibited practice to refuse to provide municipal services . . . for dwellings or providing such services . . . differently because of race or other prohibited factor. *See* 24 C.F.R 100.70 (d)(4). Section

3616a of the FHA deals with the Fair housing initiatives program. Section 3616a(a) allows the Secretary of HUD to make grants to local governments and their agencies to prevent or eliminate discriminatory housing practices. Most significantly, under Section 3616(f)(1) "The secretary shall issue such regulations as may be necessary to carry out the provisions of this section."

With this background and legal authority, the Plaintiffs claim a violation of Section 3617 as well as the implementing regulation 24 C.F.R. sec. 100.7(iii) which, on its face, makes Carl Crawford in his personal capacity liable under section 1983 for violation of Section 3617 and said regulation. Courts have interpreted Section 3617 to apply threatening, intimidating, or violent conduct, designed to drive an individual out of his home. *Haplrin v. Prairie Single Family Homes of Dearborn P. Assoc.*, 208 F. Supp. 2d 896, 903 (N.D. Ill. 2002); *Bloch v. Frischolz*, 587 F.3d 771 (7th Cir. 2009).

24 C.F.R. 100.7(a)(iii) provides for direct liability if a person "fails to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew and should have known of the discriminatory conduct and had the power to correct it. Defendant Crawford has been sued in this Complaint because he personally knew of the racial problems facing the Kirks with respect to enjoyment of their housing rights. He had the power and tools as Duluth's Human Rights and more importantly, the legal obligation to stop McGee and Panger from coercing and intimidating the Plaintiffs rights to enjoy their home due to Aaron Kirk's race. 24 C.F.R 100.400 provides HUD's interpretation of section 818 of the FHA. (*See also* Compl. ¶¶76-78).

The Declaration of Ian B. Johnson and exhibits A and B also shed light on the legal duties of the Defendants Grytdahl and Crawford. These exhibits set out the Duluth Human Rights Ordinance and the Fair Housing Supplement. The documents incorporate all the substantive rights and procedures of the FHA into the Duluth Ordinances. In particular, the Fair Housing Supplement adopted by the City of Duluth states (2) (A) "If the Duluth human Rights commission determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or about to occur, the Duluth Human Rights Commissioner shall immediately issue a charge on behalf of the aggrieved person. Since the Duluth city council adopted the full FHA act into its Human Rights Ordinance, it is fair to point out that section 3610(f) of the FHA implicitly requires the local commissioner to carry out proceedings with reasonable promptness. Therefore, since both Grytdahl and Crawford had legal duty to issue a charge under the Duluth Ordinance immediately upon discovery and then failed to do so, arguably both Defendants also violated the provision under the FHA to move forward with reasonable promptness.

Alternatively, Defendants Grytdahl and Crawford violated the Plaintiffs' rights to Equal Protection to the laws because they knew of the illegal housing discrimination, had the power to end it, but walked away from their responsibilities knowing full well that Aaron Kirk was a Black male who was being racially coerced and intimidated by his neighbors. (Compl. ¶¶ 1, 2, 4, 14).

**X.     The Federal Housing Act claims alleged in Counts IV and V of the Complaint are not time barred.**

The claims against Defendant Crawford are well within the six-year statute of limitations since he was directly involved in the June 2017 e-mails and meetings dealing with the Plaintiffs' fair housing concerns. Interestingly, a New York Human Rights Department was declared to be prevented from asserting a statute of limitation defense under the doctrine of equitable tolling because the litigants were pro se and relied upon the officer's authority. *See James v. Miller-Wohl Company, Inc*., 3 Fair Empl. Prac. Cas. (BNA 1846).

**XI.     Count V. of the Complaint states a plausible cause of action against all of the individually named Duluth Police officers who failed to provide the Plaintiffs adequate municipal police services as required by FHA section, 3601, et. seq.**

First and foremost, it must be noted that Plaintiff incorporated all of the prior paragraphs of the Complaint into Count V.  Most importantly, it was alleged that the Defendants have injured Plaintiffs by deliberately disregarding the rights of the Plaintiffs under the FHA, 42 U.S.C. 3604 (b) (2)- the services and facilities provided in connection with their residency and their right to fair housing in the absence of racial discrimination in violation of 42 USC § 3617.

Courts have recognized the validity of section 3604(b) claim for a municipality's failure to provide minority neighborhoods with adequate police services.  *See Community Improvement v. City of Modesto*, 583 F 3d. 707-709 and *Campbell v. City of Berwyn*, 815 F. Supp 1138 ( N.D. Ill. 1993). The initial case dealt with response times to 911 calls and the latter case dealt with termination of police security in an area where minorities resided.

On the other hand, an argument could also be made that the Defendant police officers and supervisors were "too aggressive" in providing police services requested by

the two the white neighbors, who made excessive 911 and other calls to the City Pound; those calls were false, harmful, and full of hatred towards the Plaintiffs and unfounded. Tragically, as a result of those calls, the Plaintiffs were constantly on the defense, placed under scrutiny, and felt as though they were criminals due to the unchecked abuse of police intervention based solely on the race of Aaron Kirk. Courts have recognized an FHA 3604(b) claim for a city's deployment of a more aggressive police services when minorities are in a neighborhood. *See Doe v. County of Kankakee*, No. 03 C 8786, 2004 U.S. Dist. LEXIS (N.D. Ill. 2004).

Finally, it is noteworthy that Plaintiffs [in Count V] have advanced an argument that the municipal services – either adequate or inadequate- caused a "Discriminatory Effect" which has been defined as a practice that predictably results in a disparate impact on a group of persons or creates, increases, enforces or perpetuates segregated housing pattern because of race. 24 C.F.R. 100.500. Therefore, the Duluth Police Department officers, as well as supervisors, actions, or lack thereof, without any legally sufficient justification, caused a "Discriminatory Effect "on the Plaintiffs" s housing enjoyment, based upon the facts presented in their Complaint.

Liability then, against the Defendant police officers, can be established under the FHA based upon their practices even if the practice was not motivated by discriminatory intent. So, regardless of whether the Kirks could or could not prove discriminatory intent (which they allege), the Plaintiffs could prevail on the 3604(b) claim for either inadequate or aggressive police services provided the Defendants could not prove legal justification for their actions.

The state actor defendants do not have, nor will they be able to formulate any justification whatsoever, for ignoring the Plaintiffs' legitimate requests for police services which they so badly needed.

## **CONCLUSION**

Plaintiffs respectfully request that the Court denies the Defendants' Motion to Dismiss in its entirety.


Date: September 4, 2023                              By:    s/ Phillip F. Fishman
                                                                          Phillip F. Fishman (MN #29622)
                                                                          8751 Woodcliff Road
                                                                          Bloomington, MN  55438
                                                                          (612) 360-0312
                                                                          phil@pfflegal.com